AMITY INVESTMENTS v. BILL BRADY v. KERRY ROGERS The three issues that all involved reporting that was not done to the insurance company, basically, the three issues were that we had not provided them that we would have an estimate to do woodwork of on the boat of between $30,000 and $40,000, although testimony showed that $25,000 of that was just for the haul-out. And so the question is, is there a transcript of this trial before us? Yes, Your Honor. There is? Yes, sir. And this is what was described, first time I'd ever done it, where everything all the direct testimony was done in declaration form, then there was cross-examination of that and it was transcript, yes. And the transcript is part of the records in appeal? Yes, sir. Well, in this case, as I said, the district court found that the insureds had concealed certain damage in the yacht by a previous hurricane. They misrepresented the changes that had been made in the haul of the yacht, and they entered into a contract to convey the assets in a manner that violated the marine insurance policy. Now, our job here is one of law, and the question that we have is, are the findings of the district court clearly erroneous? And I think that's the burden that you have on your shoulders, to show how that becomes clearly erroneous. Yes, Your Honor. If I may start with probably the easiest of the three provisions cited by the court in that the lack of providing insurance, the insurance company with knowledge that the boat was going to be conveyed. Now, the boat was not being conveyed. It was held in the name of Amity Investments. It was a stock purchase that was going to take place. But I ask you, the problem is, when do you have to tell the insurance company when, in fact, something's going to happen? Is the contract in the record? Yes, Your Honor, it is, Your Honor. Your Honor, in this court. And what did the contract say about when the vessel would be conveyed, or when the sale would be made? When it was acceptable to Mr. Rogers to buy the island and to buy the boat itself. So it had a series of time. There was no specific date. He had the right to buy it, but no obligation to buy it? Well, it was. There was a time limit in it. Specifically, I do not remember what date it was that it would be conveyed. But certainly not prior to the issue of the vessel being sunk in the hurricane. But your position seems to be on the transfer that if someone buys stock rather than acquire the asset, that that's not a transfer within the meaning of the Lloyds policy? That would be my second position. My first position would be that it had never took place. So informing, the question I have is when do you inform it? And this Court, in an unpublished decision, said that that's the problem. How often, when do you have to go to your insurer and say, this is what's going to happen? I may do this. I may do that. I mean, the oral estimate on the woodwork was just that, an estimate. Let's stick with the sale first. There are three separate issues. Okay. On the sale, you say that it was a contract to sell and that Mr. Rogers had an obligation to go forward with the sale by some date which had not yet occurred. Correct, Your Honor. So you had an executory contract? Precisely, Your Honor. And your argument is that because the transfer had not been effected under the executory contract that you were not obligated to inform Lloyds? I believe that's the case, Your Honor. Otherwise, what would I call them in the sense that we have the situation? I have a contract for sale of my boat. That's what you say. Each time that would occur, then every single thing that you were going to do, you'd have to report in. And as this Court said, inciting one that this specific Court said, the underwriters would prefer that you ended up every time you flushed the toilet, you'd have to inform the underwriters of what it was. I think that's the issue. How material are these items? Until they happen. Well, they're certainly material in most other contexts than insurance, whether or not if anyone takes an interest in the boat, because the fact is, for example, on an executory contract, who does one compensate? Well, that would have to be determined. I mean, that's an important consideration about who gets the money under an executory contract. Now, I don't know. I haven't seen the contract, so I don't know. But at least that would be an underwriting concern when you have somebody who has an equitable interest in a boat. Well, until it happens, Your Honor, I don't see the problem we have is how often do you go back and report every single thing that's going to occur? When you divest yourself of the asset, that would seem to be the one occurrence, wouldn't it? I absolutely agree, and that's why there was no divestment. So it's not as though you're repairing the toilet tank. You're selling the whole boat. Well, that is accurate. I will concede that. But the problem being is that how often? I mean, these are material items, and until they actually take place, you would be calling your insurance carrier every single time that something happened. Every single time you sold the boat. Or any other thing that occurred. Or you went into any executory contract. And what would happen at that effect? Well, it's a whole other thing. Well, I think that it's certainly something they would be interested in, that you're trying to sell the asset they're insuring. You're trying. I mean, listing for sale, I grant you. But once you have an executory contract, it seems that one would want to know that. Because at that point, most contracts, and I haven't seen this one, so I don't know what it says, has a risk of loss clause, and so an indemnification. Those things are very relevant to the insurance company. Your Honor, in this case, the actual transferred ownership of the property was still in amity no matter what happened. It was not transferred to any individual. Well, that's your second argument. I'm sorry? That's your second argument. That you didn't have to report it at all because it was a stock transfer rather than an asset transfer. Correct, Your Honor. There was no change in ownership. Most cases in other contexts that deal with covenants against an authorized assignment would tend to indicate that, you know, if you have a situation like this, that probably indicates a transfer that needs to be reported. In other words, I mean, it's different if it's General Motors and you're buying stock in that. But if you're talking about a closely held corporation, isn't it quite different? Well, given that metaphor, yes, with General Motors, but it's still the fact that it's a decision without a difference. It's still the ownership going to be in the name of the corporation, not in the name of the individual. Did you want me to say anything? No, I'm listening. There are a few other issues you want to do. We do, Your Honor.  It tells us whether 30 to $40,000 worth of woodwork is material. I'm sorry, Your Honor. Whether 30 to $40,000 worth of woodwork is material. Is there anything in the record either way on that? No, Your Honor. It's just a statement that, in fact, what occurred in the testimony. And of that, because it was the largest vessel ever built in Belize, you have to take it to Honduras, you have to take it to Guatemala to pull it out of the water. And that's $25,000 just to do that. Is that in the record? Yes, it is, Your Honor. And remember, this is an 82-foot, 100-ton vessel all made of mahogany. And is it 30 to $40,000 appraisal or estimate? Is there testimony that that includes the 20 to $25,000 to pull it out of the water? Yes, Your Honor. And that the actual woodwork is only 5 to 10,000? And it was an oral estimate, yes, which never took place. Again, another — it's another event that never occurred. And you could have more of them. I mean, if you were to get — to take this to ridiculousness, what if you were to have a series of other estimates? How many — do you report all the estimates to the insurance company? I mean, this is a — this is a wooden boat. It takes regular care, requirement, and maintenance on a daily basis. But how do — does the record show whether this was regular, ordinary maintenance or something special? No, Your Honor. This boat, because we had a live-on captain and crew that regularly worked on the boat, it was the only things that were not done by them that would be done. And it had to be pulled by a surveyor every so often, because each time — this boat had been insured by certified underwriters for 18 years. The same syndicates out of London had insured it. And it would be required. Is there evidence, for instance, that every year or so we had to do 30 to $40,000 worth of woodwork, that this was not anything unusual, it was a regular event? There was testimony to that effect yesterday, and there was no testimony to refute it. Let me return to the transfer, if you might. The insured under the policy is not only Amnesty Investment, but it's also William T. Brady, correct? Well, ultimately, it was transferred just to Amity, Your Honor. No, no. I'm talking about the insurance policy. The insured — there are two co-insureds, Amity Investments and William T. Brady, right? Your Honor, I think it was — I think that started out that way. It was in Mr. Brady's name, then it was transferred to Amity, and I believe it's always been — I'm not talking about ownership. I'm talking about the policy. I don't know. Well, I'm just looking at the policy, it seems to indicate two. And the misrepresentation clause talks about if there's any misrepresentation concerning any matter of the interest of the insured. So if, in fact, William Brady was still — were still an insured as of the date of the policy, and assuming, for the sake of argument, his interests had been transferred, that would be a material misrepresentation under the policy. With that hypothetical, I know you're not agreeing necessarily with the facts. That would be true.  I think that still — If William Brady has no more interest in the vessel and he's an insured, that would be a material misrepresentation. That particular point, yes. All right. Thank you. There were 18 years of premiums being paid to the insurance company, and this boat received regular maintenance with a live-on crew and a live-on captain. That itself — and it required surveyors on a regular basis because they wanted the insurance. The insurance company required it. These were certified people from Lloyds of London that were required to review the boat. The damage on this boat was very little. It was immaterial. The damage is not even proper. It should be nothing more than regular maintenance. Now, the district court found that your client did not reveal the vessel had suffered damage in a previous hurricane, which he had repaired at his own expense without making a claim. Is that right? That's correct, Your Honor. And that was an independent ground for finding misrepresentation. Did you argue that on appeal? Yes, Your Honor. The amount of money that was involved was less than $5,000 that was involved. There's a policy deductible of $30,000. However, in fact, when the surveyor came out to see the boat, it was disclosed to the surveyor. Hurricane Mitch was another hurricane that went through the Caribbean, and that was in 1999. The surveyor was notified and told of that because that's where they live out there. That is a hurricane area, and people are cognizant of those situations. So it actually was told to the surveyor whose report went to Lloyd's, and he was Lloyd's person. He was the person that was there to do that. And again, a boat this big, a $5,000 repair, is so immaterial when you think about the mahogany in this boat. Very immaterial. You can imagine, it's almost like Noah's Ark when you start thinking about it, all made out of wood. I'm listening. Well, I would ask this Court to consider the fact that the materiality and the idea of how often one would have to report everything that goes on, and I would cite this Court to its own decision in this particular district. Does the record show that it was only $5,000 worth of damage from the last hurricane? Your Honor, it was testimony to that effect, yes. Mr. Brady testified to that. And there has never been a claim on this boat in the entire 18 years. This is the first claim. Of course, it is a substantial one, I grant you. It was, yes, a substantial claim. Does she have any further questions? Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court. Geri Roussolini on behalf of certain underwriters subscribing to this particular policy at issue. I apologize for my voice and the cough, and hopefully it won't be a problem. Let me first state that the Court has correctly identified that it is a clearly erroneous standard. More importantly, there are only two issues that the appellants have brought before this Court, notwithstanding the fact that they have now attempted to argue three. If you look at their brief, it states clearly understatement of issues presented for review A and B. There is no three. Now, the third ground for misrepresentation that was found by the district court was the damage by the hurricane. That was not briefed in the court in the appellant's brief and is not before this Court at this time. In and of itself, it constitutes an independent grounds for misrepresentation and a grounds for rescission of the policy. So even if you take the appellant's brief, we still have a grounds for rescission in this case. And one of the problems that you're going to find is, notwithstanding counsel's statement that there is testimony regarding a number of issues, there are not statements in the record and evidence in the record regarding a number of the issues. There is, as found in the very detailed findings of facts set forth by the district court, I'll address the issue that's not before this Court, but I will point out that there is testimony by Mr. Brady in his direct testimony that he did pay for damage. There was damage to the Lady Alexandra under Hurricane Mitch, but there is no testimony whatsoever as to the amount of that damage. No information was ever provided to underwriters regarding that. The district court found that, and there was no testimony of that. Kennedy, on what basis is it material if someone says there's damage and you have no idea whether it's a dollar's worth or a million dollars' worth? Well, that's the problem, is how does underwriters – the doctrine of uvumae fide provides that all information regarding the vessel, particularly as to things like damage, are to be presented to underwriters. Underwriters can't – the whole idea is that you've got the historical nature of this doctrine is you have information, you have vessels spread out all over the world, and people present them to underwriters for insurance. And underwriters have to rely upon these individuals to provide information as to the condition of the vessel. Now, if the vessel has been damaged, if the vessel has changed ownership, if the vessel is undergoing significant repairs or any type of repairs, underwriters are entitled to that information under the controlling law, both under California statutory law as well as the case law that exists in both State California and Federal law. The issue of damage – Do you have to report non-material acts or only material acts? Under the doctrine of uvumae fide, the insured is to provide information, basically is bound, even if not asked, to reveal every fact within his or her knowledge that is material to the risk. Right, material facts. That's correct. So if it's – if you had, for instance, a – I don't know, a rope that was damaged during a hurricane, you wouldn't report that. You replaced it for $20, you wouldn't report it. That's correct. But you're not – I mean, I don't understand why at the trial, you said they didn't say what the damage or – did anybody ask them what was – how much was the damage? Mr. Brady was asked regarding the nature of the damage, and he, at that point in time, really couldn't recall, except for the fact that there had been damage during the hurricane, that he did not report it to underwriters. So the trial court found that to be significant, the fact that there was damage during a prior hurricane and that it was not reported in any fashion to underwriters. And you asked what was the damage. He said, I don't know what it was, I don't remember the damage. That's correct, Your Honor. I don't know if it was damage. That's correct. Now, to focus on the two issues that are before the Court by appellant's brief, the ownership issue, as the Court has correctly – district court found – Before we get to that, can I ask you about the $30,000 to $40,000 worth of repairs? Yes. How do we know whether that's material? The $30,000 to $40,000 of repairs is to the whole. There is no testimony, notwithstanding counsel's representation to the fact, there is no testimony regarding the idea that it would have cost $25,000. The testimony in the Court was by Mr. Rogers, who has the contract to purchase the Lady Alexander through Amity Investments. And his testimony was that he had received an estimate to have $30,000 to $40,000 worth of haul work done to Lady Alexander. There was no testimony regarding the cost of dragging it out of the water. There was no cost of information regarding transportation. It was $30,000 to $40,000 of haul work. This is a vessel. There was no indication that that had been done regularly, that $30,000 to $40,000 was done every year. There was no testimony in that regard. This was something that had not been done regularly. And the testimony was that there was this was not a standard practice. So $30,000 to $40,000 of haul work is not an insignificant amount of money and would have been considered and was considered by the district court to be material in light of the information and condition of the vessel. So at this point in time, notwithstanding counsel's, there is no testimony regarding the transportation. Based on what the district court had before it, it found material the fact that there was an admission that there was $30,000 to $40,000 worth of work to be done on the vessel. Go ahead. As to the ownership issue, the, as you correctly point out, the policy specifically states, and that would be in Exhibit 2, page 17, which we've attached as part of our supplemental record, transfer of interest. Policy specifically states the insurance shall be void in case this policy or the interest is insured, thereby be sold, assigned, transfer, or pledged without the previous consent in writing of this insurance. And which was this? Basically, we've argued that this was basically an assignment, transfer, or pledge. It would qualify as one of those three under the nature of the contract that was presented. The court found that to be controlling, that they, he specifically ruled that. Let me interrupt just for a moment. Is it true that this, you discovered this during trial? Yes, it is. Actually, we found out about the transfer of interest during the course of discovery. We found about that afterwards. It was not something that underwriters knew about until discovery was undertaken. And then what steps did Lloyds take to raise that as an issue? Well, that issue was raised during trial. The issue was raised. We knew that there was a possibility of that issue, and it was raised in the initial reservation of rights and denial letter that was issued by underwriters. So we knew that issue may exist. We knew, based on the investigation undertaken by the surveyors in Belize when the claims were submitted and underwriters sent the surveyors down to Belize to look at the vessel, he had uncovered evidence that there might be an ownership issue. And that issue was raised in the initial denial letter. And then it was only after discovery was undertaken in the declaratory relief action that underwriters received confirmation that, yes, there was a contract to sell the Amity shares. We don't have the contracts. You have to describe it for me. Was it all of the shares in Amity, half of the shares of Amity? My understanding, it's all of the shares of Amity, Your Honor. It was a complete sale. And it was closely held corporation? The only shareholders to Amity were Mr. Brady and his wife. So it substantially changed the nature of the risk. You asked about why is that important. Under Malone, which is a Ninth Circuit case, those types of ownership interests, that changes the nature of the risk for underwriters. You've got a complete change, even though Amity is listed. It's not a change in ownership, which gives rise to the technical argument made here, because the corporation owns the boat, right? Well, corporation. It certainly changes the risk. It changes the nature of the risk, and underwriters are entitled, and certainly under prevailing case law in this district, we're entitled to know that information as part of the ownership. But the additional issue that you did raise is Mr. Brady is listed as an insured under this policy. And continued to be through the end of the policy period? That's my understanding, yes. There was no change in the enlisted insureds throughout the policy period. So what you have here basically are detailed findings of fact based on evidence presented at trial. There was considerable amount of evidence. The district court focused on the three issues that it ruled on in its findings of fact and conclusions of law. All three independently are grounds for misrepresentation and rescission of this policy. So you take away one or two, as long as you have all three. All three were made based on detailed findings based on the record. There's nothing clearly erroneous about any of those findings. There's been no presentation of any evidence in the record, no citations to evidence, because there is none. The record as reflected by the findings of fact and conclusions of law are correct. There's no other evidence, and the appellant cannot cite to that evidence in the record. You'll notice there is a complete lack of citation to that type of testimony. If the testimony exists, it should be cited in the brief, and it is not, because it doesn't exist. Underwriters maintain that the decision of the court is supported by the record. The issues presented as to ownership, significant work as to the vessel, and prior damage are all material, each is independently grounds for rescission, and all are correct. Thank you. Thank you. Your Honors, I would only like to press brief if I may. The fact that I believe the lower court's decision was based on the fact that there was not any reporting back to Lloyds. The question here is the materiality of what should have been reported or not should have been reported. How are we supposed to assess that on appeal? That's a difficult question. The district court obviously thought this was material. Looking at a cold record, it's difficult for us to review that. So on what basis and what standard review do you think about employee to say that the district court was wrong in determining that the misrepresentations were material? Well, I think, Your Honor, I think that the under Federal Civil Procedure 52, this adequate evidentiary support offer is induced by an erroneous view of the law. I think that this Court can make a decision that the materiality, based upon the facts of the size of the boat and everything else that existed, are such. But I don't think that's the question. I think that the lower court's decision was that you didn't report them. It didn't go a step further, which should have said, okay, these should have been reported because they were material or these should not have been reported because they were immaterial. I think that's where the issue lies today. I disagree with the record. Counsel and I both were at trial, but we don't have the same recollection of what occurred. And again, I go back to the district court. Well, it's not a question of recollection. I assume you both reviewed the transcript before the argument, and there shouldn't be a disagreement about what occurred.  I agree, Your Honor. And I think Mr. Rogers is here today for the same reason. Right. But, I mean, the citations to the record in brief help us to clear up any of those controversies. You didn't have them in your brief. True. As required by our rules. I go back to the last issue, if I may, that you raised, Your Honor, about the fact that the ownership was not transferred. You can talk about sold, when it talks about sold or assigned or whatever, the language in the policy, there was no transfer. And I submit that the issues that they were immaterial, and I'd ask this Court to reverse this position or send it back down for pretrial. Thank you. Thank you, counsel. Case disargued will be submitted.
judges: Lay , Reinhardt, Thomas